# Exhibit C

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

--------------------------------X Docket#
LARRY SWANSON,                   : 15-cv-05383-ENV-TAM
                                 :
            Plaintiff,           :
                                 :
   - versus -                    : U.S. Courthouse
                                 : Brooklyn, New York
                                 :
MANHATTAN BEER                   :
DISTRIBUTORS, LLC et al.,        :
                                 : February 2, 2026
            Defendants           : 10:23 a.m.
--------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR PRELIMINARY
SETTLEMENT APPROVAL HEARING
BEFORE THE HONORABLE TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For the Plaintiff**:          **Steven L. Wittels, Esq.**
                                **Tiasha Palikovic, Esq.**
                                Wittels McInturff Palikovic
                                18 Half Mile Road
                                Armonk, NY 10504

                                Ethan Daniel Roman
                                Wittels McInturff Palikovic
                                305 Broadway, 7th Floor
                                New York, NY 10007


**For the Defendant**:          **Jeffrey H. Ruzal, Esq.**
                                **Christopher J. Yee Coyne, Esq.**
                                Epstein Becker & Green, P.C.
                                875 3rd Avenue
                                New York, NY 10022


**Transcription Service**:      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

THE CLERK:  This is Civil Cause for a Preliminary Approval Hearing in docket 15-cv-5383, *Swanson v. Manhattan Beer Distributors, LLC et al.*

Will the parties please state their appearances for the record starting with the plaintiff?

MR. WITTELS:  Good morning, your Honor.  Steven Wittels for plaintiffs and the proposed class.

MR. ROMAN:  Good morning, your Honor.  Ethan Roman for plaintiffs and the proposed class.

THE COURT:  And I believe we have at least one person by phone.  Is that correct?

MR. WITTELS:  Well, we should.  Tiasha Palikovic, our partner from the firm, she's supposed to be dialing in.  Did she reach out to you?  The clerk is nodding.

THE COURT:  Okay.  Can she hear us?

THE CLERK:  She can but she's on mute.

THE COURT:  Okay.  Ms. Palikovic, are you on mute?

(Pause)

THE CLERK:  I see that she's still connected.

THE COURT:  All right.  I just wanted to confirm that she can hear.  This is why we don't do hybrid typically.

MR. WITTELS:  I appreciate it, your Honor.

Transcriptions Plus II, Inc.

Proceedings

THE COURT: We're trying. We'll do our best. Ms. Palikovic, if you can hear us, you may un-mute and state your appearance for the record. My courtroom deputy reports that you appear to be on the line but we are not hearing you if you are speaking.

All right. And for the defendants?

MR. RUZAL: Good morning, your Honor. For defendants, Jeff Ruzal and Christopher Coyne of Epstein Becker & Green.

THE COURT: All right. Good morning to you both.

So as you all know, we're here today for a fairness hearing as to the proposed class action settlement in this case. And I'd like to start out with some procedural history since we're here to make a record of the appropriateness of approval.

So we have a little summary and it's not a short one in terms of the procedural history in this case. So if you'll just bear with me, the procedural history includes plaintiff, on behalf of himself and others similarly situated, initiated this putative class action on September 18, 2015 with the filing of the complaint at ECF 1.

Plaintiff, along with since dismissed plaintiff -- is it Heady or Heedy?

4

Proceedings

MR. WITTELS:  Heady.

THE COURT:  Heady.  Filed an amended class action complaint on November 2, 2015 at ECF 14.

On December 12, 2016 defendant filed a fully briefed motion for summary judgment.  And on July 10, 2018, Judge Vitaliano partially granted defendant's motion for summary judgment dismissing plaintiff's federal claims arising under the Fair Labor Standards Act and plaintiff's claims for overtime wages under the New York Labor Law at the memorandum and order issued at ECF 68.

The claims remaining were state law claims for unlawful deductions from wages and wage notice violations.

The parties then filed a joint discovery schedule on August 15, 2018 at ECF 73.  The Court, not myself, it was a different magistrate judge at the time, declined to adopt the discovery schedule and instead set a fact discovery deadline of December 28, 2018 and sent the case to court annexed mediation.

The Court also reluctantly granted the parties' motion to set aside mediation due to the parties' disparate views on class certification and the merits. And that motion to set aside was at ECF 82 followed by an order issued on November 18, 2018 on ECF.

5

Proceedings

Concurrently, on November 6, 2018, the parties agreed to dismiss Patrick Heady from the suit individually and as a purported representative of the putative class.

And on November 8, 2018, Judge Vitaliano dismissed Heady from the case noting that the parties agreed that, and I quote, "Heady will not and shall not participate in any manner in any resolution or settlement as a member of a putative class or otherwise relative to the claims asserted by the plaintiffs in the first amended complaint."

On February 1, 2019, then Magistrate Judge Mann denied plaintiff's request to stay discovery due to the late notice of the request and the absence of defendant's position.

On March 22, 2019, defendants submitted a letter motion for leave to file a motion for summary judgment.

On March 26, 2019, plaintiff filed a letter motion for leave to file a motion for class certification and plaintiff later noted an intent to file a cross motion for summary judgment as well.

On April 10, 2019, Judge Vitaliano ordered that the parties' cross motions for summary judgment were to be fully briefed by July 24, 2019.  And on October 19,

6

Proceedings

2020, Judge Vitaliano granted plaintiff's motion for summary judgment as to the unlawful wage deduction claim and denied plaintiff's motion as to the New York Labor Law wage notice violation claims.

Additionally, defendant's motion was denied as to plaintiff's wage deduction claims and granted as to plaintiff's New York Labor Law wage notice violation claim brought under NYLL Section 195.1(a).  And that is all included in an October 19, 2020 memorandum and order.

Are we all on the same page so far, Mr. Wittels?

MR. WITTELS:  That's right, your Honor.  Thank you.

THE COURT:  Okay.  And Mr. Ruzal?

MR. RUZAL:  Yes, your Honor.

THE COURT:  All right.  Shortly thereafter, the parties engaged in mediation but the mediation was not successful as reported in the status report docketed at ECF 149.

On June 15, 2021, Judge Vitaliano invited the parties to brief the motion for reconsideration of plaintiff's overtime claim under the New York Labor Law and plaintiff filed a motion for reconsideration on July 21, 2021.

On November 22, 2023, Judge Vitaliano granted

7

Proceedings

plaintiff's motion for reconsideration and that is docketed on November 22, 2023 with an ECF memorandum and order.

On September 19, 2024, following some discovery conferences that I held, plaintiff filed a letter notifying the Court that settlement discussions had been fruitful and that the parties intended to prepare the necessary papers for preliminary class settlement approval.

The Court granted the stay and directed the parties to file a motion for preliminary class settlement approval. The Court granted the stay and directed the parties to file a motion for preliminary class settlement approval by December 20, 2024. That was included at an ECF order docketed September 20, 2024.

After numerous extensions, the unopposed motion for preliminary class settlement approval was filed on November 15, 2025 at ECF 179. And on November 18, 2025, Judge Vitaliano referred the motion to me and I scheduled today's hearing. So that's what brings us here today.

The motion papers have been very informative and they have addressed nearly all of my questions and concerns. There are a few areas though where I'd like a little bit more information from the parties and I'd like to develop a relatively full record as to the negotiation

8

Proceedings

process and the fairness of the proposed settlement agreement. So I will be going through the *Grinnell* factors asking both sides a number of questions.

To frame the analysis, at the preliminary approval stage the Court of course needs to make an initial evaluation of fairness prior to notifying the class. Preliminary approval is guided by a likelihood standard. In other words, whether the parties have shown that the Court will likely be able to grant final approval and certify the class.

I know that this standard is not toothless and that the judicial role in reviewing a proposed settlement is demanding, it is rigorous. If you've read any of my class action preliminary approval opinions, you'll see it's rigorous and I look at each element very closely.

Additionally, the advisory committee notes to Rule 23 stress that preliminary approval is an important event and that it needs to be based on a solid record.

That said, I am of course mindful of the strong judicial policy in favor of settlements particularly in the class action context. And if we conclude that the notice to class members is justified by the parties' showing as to the likelihood of final approval and class certification, the Court must then direct notice in a reasonable manner to all class members who will be bound

9

Proceedings

by the proposal.

With that framework in mind and the procedural history behind us, I'd like to begin of course with the likelihood of final settlement approval, then turn to the likelihood of class certification. After that, we can discuss the parties' proposed manner and form of notice. And we noticed a few small things in the notice.

So I'd like to first turn to the likelihood of final settlement approval and take a look at the procedural factors including adequate representation and arm's length negotiation in terms of how we got here.

So Mr. Wittels, could you please tell me a little bit about the discovery efforts prior to settlement? I know they had been ongoing for a long time and I'd just like to make a record of it.

MR. WITTELS: Certainly. The first battle of that discovery came after and during our winning summary judgment on the deductions claim. I call it deductions. It's been recast as reimbursements so that when notice goes out to the class, those people who, drivers who had money taken from them for mistakes or purported errors will be getting money as part of the reimbursements class in A and B.

The discovery we had really ensued for plaintiff Swanson who by looking at (A), his time records

10

Proceedings

and his pay records to, really the pay records, to understand how much had been taken from him.

And in terms of trying to get discovery for the class in terms of the mediation, we made many requests to the defendants to produce all of the documents showing not only regarding Mr. Swanson but the entire class or purported class of drivers. And that involved trying to figure out how much was actually taken from the drivers by way of these, what we allege, were unlawful deductions. And what Judge Vitaliano found was a violation of the New York Labor Law with respect to those deductions.

One of the main documents that we were able to obtain was called a shortage sheet and the shortage sheets were sort of a preliminary guide if you will that the company used when they calculated how much the drivers actually had been -- what their shorts were. But it turned out during the mediation process that those numbers were really not accurate because there were reconciliations done by the driver and by managers that were not in those documents.

And what we discovered was that defendants had done a very deep dive with their own people who reviewed all of the accounting records, all of the payroll records, all of the, you know, accounts receivable

Transcriptions Plus II, Inc.

11

Proceedings

records to try to come up with a number beyond what we knew.

And what we knew was prior to 2013, I think it was in -- was it April?  That the drivers had their pay directly -- had the deductions directly taken out of their pay.  That number, or that procedure, changed after April 2013 and drivers in fact had to show up at like a -- there were two ways they could do it.  They could put the money into a machine that they were alleged to have shorted the company, or they went to the window and paid directly.  So that came after '13.

And that, therefore, the company still was collecting deductions.  They just weren't doing it in that fashion.  So we looked at those type of documents during the mediation process to determine what the number was.  And it ended up through our own calculations, and we had a software person with a lot of familiarity in software expertise, he was able to come up with a good model for what the damages were.  And it ended up, and then we put this into the papers, or if we didn't -- I think we did.  Our best model was that we were able in the end to come up with a settlement number that was approximately 60.6 percent of the total damages which was about 1.45 I think was the number.  And I'm sort of rounding.  Right?  Yeah, 1.45.

Transcriptions Plus II, Inc.

12

Proceedings

And so that's how we came up with the -- through the discovery. I know you asked about the discovery. How did we come up with a number to arrive at the roughly 900,000 that was allocated in that way to the deductions class? Which really was the strongest case because once Judge Vitaliano had granted summary judgment to the defendants on the motor carrier exemption, that took away the heart of the case.

That was the major problem because at that point we had believed -- until that point we had hoped to show that the overtime claim was the larger aspect of this class action because we felt that the regular rate that the defendants were calculating did not include commissions. The drivers from Manhattan Beer would go out on their delivery routes and they would deliver kegs of beer, they would deliver bottles, many bottles and cases to restaurants, to bodegas, supermarkets and they would get commissions on these deliveries.

We had argued that the commissions should have been included in the regular rate which would have really been a real boon to the workers, but that was decided after.

And you asked about discovery. Extensive discovery on the motor carrier aspect as to whether we could show that the company believed there was interstate

13

Proceedings

commerce. We argued no. We took discovery on that. I took the deposition of Mr. McCarthy, the operations manager from Manhattan Beer. So we questioned him.

We had voluminous documents, I mean Redwells full of documents about their usage of how they did their -- how Manhattan Beer actually managed its business. And in the end, the defendant prevailed on that showing that in fact interstate commerce existed even though they only sell beer and other beverages in New York. But the judge still found that we couldn't overcome the exemption.

So then even though we had somewhat of the numbers during the mediation process and our guesstimates, we still couldn't reach a number. Defendants wouldn't agree. The mediator couldn't bring the parties together.

So we went back to litigation and the judge invited us to make a motion for re-argument on whether the New York Labor Law was not preempted or exempted, and he revived the case.

But the process then was is there was a minimum wage case at best because the only thing left was the minimum wage and the numbers in minimum wage we actually -- we didn't put these numbers in the papers but at that point in 2009 when it started it was only $7.25

14

Proceedings

which went up to $9 and that was the New York State rate. New York State specifically was a little higher, $11 in 2016 up to now it's about $17.  But there was still a tremendous hurdle to overcome in terms of trying to obtain discovery because if your Honor will remember from a few of the conferences we had, the discussion was are you even going to be able to show standing for your own plaintiff to represent the class of overtime employees? And as you know, you've seen that ten-year-old case, there was obviously fighting at every turn here.

We were able -- we were not -- we're very, very experienced and competent in wage and hour cases.  I say we, our firm because we've done many settlements.  And in trying to show whether workers were denied overtime, you often look at certain components that are not readily available.

In other words, when a defendant does not keep time records for clock in and clock out, and you're alleging that person works off the clock, you have to show certain data points, indicia of the overtime.  Your Honor I know talked about hearings, you've had a lot of these cases.

So the things we were asking for were time records for the class, GPS and camera, GPS records, camera data for the class.  Drivers, did the drivers --

15

Proceedings

were they tracked by defendants?  Because we know that there were handheld devices that the drivers used. Meeting and agenda notes and complaints from employees. And we were not able to get all of this, or most of it, because defendants again objected to the fact that we didn't have -- we weren't entitled to class discovery. We had that burden.  And your Honor will remember in the February 13, 2024 hearing that we had with you, and I have the transcript, your Honor was somewhat, what's the word I would use, hesitant about whether we would be able to show standing.  You though they would be maybe -- you said they may be very individualized determinations about damages.  So while we were able to show defendants we believe that our plaintiff had four weeks of overtime that he wasn't paid for, they argue that despite that the premium pay offset, the premium pay that he was paid would offset any of the damages that he had and leaving us a very de minimis number which is why you know and you can see in the settlement we allocated the great bulk of the settlement to the drivers where we know there was a real and hard number that we could ascertain.

So the driver -- so our inability really to overcome the problem with Mr. Swanson, you know, eight years into the case of when the case was revived as to overtime made it a very very difficult process but we did

16

Proceedings

the best we could.

THE COURT: So on that score, you know, you've detailed some of the discovery efforts that were undertaken which is a very helpful context, some of your strategies based upon your prior history and experience, which is great.

But one question that I have is like a through line for today is, you know, the release here --

MR. WITTELS: Right.

THE COURT: -- anticipates a release ?of all New York Labor Law claims up through the time of approval of the preliminary order. And you know, I frankly have concerns about that in terms of whether or not there may be claims out there that we don't know anything about for drivers who are not Mr. Swanson. And I'd like you to just discuss that aspect of the settlement agreement and how that is adequate representation of the class's interest writ large.

MR. WITTELS: Right. Well, that was something that we seriously discussed with the defendant. There is not -- it's a broad relief but it's only of the claims that were or could have been brought. So if there are other claims -- in fact, one of the issues at one point during the negotiations in the past year or two I think was a strike by the drivers over certain labor issues and

17

Proceedings

that was actually resolved so it didn't have to be addressed.  But it is not a release of every claim.  It's only those that were or could have been brought.

So it doesn't encompass any individual disputes that the drivers would have.  And I think defendants -- or the helpers.

THE COURT:  Mr. Ruzal, do you agree with that interpretation of the release?

MR. RUZAL:  Your Honor, I do agree with that and also giving the longstanding history of this case and the ample time with which Mr. Wittels and his colleagues could have investigated the potential wage and hour issue that could have arisen and should have arisen as very capable wage and hour counsel for plaintiffs, that is something that more likely than not, if not certainly, would have come up.  But generally speaking, yes, I agree with Mr. Wittels' characterization.

THE COURT:  All right.  That's one thing that I wanted to confirm that we're all on the same page in terms of whether that release precludes everything or just the claims more narrowly curtailed as Mr. Wittels described.

Another question that I have about adequate representation aspect, Mr. Wittels, and I think this goes to some of the concerns that were discussed at that

18

Proceedings

hearing, I think it was telephonic, February?

MR. WITTELS: Yes.

THE COURT: Okay. I remember where I was weirdly.

So one of the questions I had was about the different subclasses and sort of how Mr. Swanson, as a representative of the different groups and whether or not his knowledge base and/or the evidence you developed throughout the course of the discovery helps to inform those subclasses and how each of those groups are ascertained and how they're going to be treated.

MR. WITTELS: Sure. There are two reimbursement subclasses, i.e. production subclasses, subclass A and subclass B.

Mr. Swanson is really both in subclass A and subclass B in the sense that he was employed from the time he filed this and before actually. Probably one of the longest employees at the company. So he was there in 2009 which is going back for six years from when we filed this in 2015. And so he was familiar and could articulate, and did at his deposition, how the deductions policy worked with respect to the changes. First, how the money was automatically deducted from his paycheck and then second, how he was compelled to actually go to the window or put his money into the machine. So he is a

Transcriptions Plus II, Inc.

19

Proceedings

fair and adequate representative of subclass A.

He also, as I say, is part of subclass B in the sense that when the company stopped doing deductions, and that by the way is -- we're not asking for any extra money to the plaintiff's attorneys for achieving this, but we achieved a very good result. They stopped deducting. It took a fight. And I specifically asked Mr. McCarthy at his deposition about the policy of deductions and he acknowledged it was still happening at the time when I deposed him. So they stopped doing it.

THE COURT: Do you know when? That's a question that I had in reading the papers. When did they stop? Do you know, Mr. Ruzal?

MR. RUZAL: Well, they stopped when we cut it off for the drivers which was in 2016. Yeah, after April 2016 we didn't have -- they represented to us, because they didn't have a specific cutoff date because it was still a question of whether they were still doing it. But if cash was missing and the drivers often sometimes got cash from the customers to pay for the beverages, and if that was missing, of course that's not a deduction. You have to -- you can fire the employee or they'd have to come up with the cash, but they stopped the deductions after we believe April 15, 2016.

But we felt that it would be proper to at least

Transcriptions Plus II, Inc.

20

Proceedings

give the drivers some remuneration for that period.  And in fact, many of the drivers were hired after, from April 16th to the present, because this is such a long, you know, class period up to the present.  And therefore, we allocated, you know, a minimum amount of $75 but we figured that the -- we calculated the average for those drivers in that subclass B was about $110 --

THE COURT:  For B.

MR. RUZAL:  For B.  So that really was negotiated between the parties as a fair way, you know, with the help of the mediators as a fair way to sort of if you will encompass drivers who may not have had any deductions because when we spoke to Mr. Swanson, he said a lot of the drivers are not even going to know when they see this that there was never a deductions policy because we stopped it.

THE COURT:  Well, that was my question about subclass B.  Like what are their damages?

MR. WITTELS:  Well, their damages were a rough justice that they would at least achieve something here as part of -- that's why they're getting money.  We couldn't know with absolute certainty that they didn't have deductions but we felt that, and Mr. Swanson agreed, we spoke to him about this actually at length, that at least it would be fair to include them to recover

21

Proceedings

something. And given that we were very uncertain about the overtime issue, in a sense you could make the argument that this is also, the drivers are getting money also for an inability to ascertain exactly what the status was on their overtime.

THE COURT: Mr. Ruzal, would you like to add anything to that? Because the distinction is to subclass B versus subclass A. I hear you that Mr. Swanson is an adequate representative which is still the factor we're on, you know, he covered both periods. But I'm kind of jumping ahead to the substance and fairness in terms of the two classes. Could you expand on how the defendants, you know, processed this determination and why you were willing to agree to it? Because to me, reading the papers, it's very hard to understand what the damages really were for the different classes. So any perspectives on that are welcome.

MR. RUZAL: Certainly, your Honor. Thank you. And also, within the context of this being for settlement purposes only without any admissions with respect to any representations Mr. Wittels had made specifically with respect to a particular cutoff date after which point, you know, purportedly there were no reimbursements or deductions made from any of the class members' wages because of a change in practices.

22

Proceedings

I'll add, however, as we often see in wage and hour disputes, even when there is a potential overriding change in policy or practice such that is alleged here again for purposes of this fairness hearing today, your Honor, there are at times still unique one off instances perhaps where we've seen, again not in this case at all, but more generally speaking potential instances of an individual deduction being made against policy.  And there could also be where, again subject to an individualized inquiry and investigation as to whether any of the potentially affected class members experienced a deduction from their wages in the latter period certainly remains a possibility but would take immense time to be able to thoroughly investigate it and then confirm or deny.

And in connection with that and our understanding and the age of this case we thought it was most appropriate to earmark a smaller set of funds for purposes of determining that there, again consistent with the fact that there is a practice and policy of not seeking reimbursement but nevertheless confirming that in fact these individuals would be made whole in the effect, in the event, excuse me, your Honor, that perhaps as a unique sort of a one off scenario where this could have potentially happened.

23

Proceedings

THE COURT:  All right.  I mean that does make sense and I appreciate the candor.  You know, you're viewing this as some kind of rough justice in an effort to ensure that folks who could have potentially been subjected to those policies even after their official end date would be made whole.  So I think that that helps explain the subclass B questions that I had.  So I appreciate that.

Is there anything else anybody wants to add on that?  And this really is a substantive fairness question at this point on that, why this is equitable treatment vis-à-vis the different plaintiffs.

MR. WITTELS:  No, I think I've covered that it's the best we could in terms of trying to get to an equitable assessment and cover everybody as best we could.

THE COURT:  Fair enough, fair enough.  So we're still in the procedural factors on the likelihood of settlement approval.

The next factor is arm's length negotiation.  And I don't -- I think the record speaks for itself that this case has been very heavily litigated and hotly contested throughout.  And the final conclusion of the case, or hopefully final conclusion of the case, is this proposed settlement.

24

Proceedings

Can you just shed a little light on how you determined to go back to table, how you arrived at those particular mediators?  They're obviously very well known but we should make a record of their qualifications a little bit in terms of how you chose them and whether or not you found that to be an arm's length process.

So Mr. Wittels, and then I'll turn back to you, Mr. Ruzal.

MR. WITTELS:  Sure.  Sure, your Honor.  We had never had a mediation with Mediator Kheel before.  I think he was on the panel of the --

THE COURT:  He certainly was, yes.

MR. WITTELS:  Right.  And had been referred to us.  He was very knowledgeable and he did videoconferences so we got to know him over multiple sessions of the mediation as well as individual sessions that we had with him one on one.

And he did his best.  He has done I understood many class actions which is why from his résumé we had selected him.

He was also very diligent in the sense that when things were falling apart he would call us, he would keep up to date.  He wasn't a process mediator who just relayed demands and offers.  He really tried to be creative.

25

Proceedings

Unfortunately, it didn't work.  It was a very tough process.  It was about six months where we were back and forth with the defendants during that period with him.  And again, that had been -- I think Judge Mann had referred us to the mediation process in the eastern district and that's what we followed.

So when it fell apart, we (indiscernible) obviously the litigation and motions, a lot of motions in this case.  And there was an opening I think when your Honor came on and sort of encouraged again trying to open the door again to try to see if there's a path to settlement.

So we engaged with Mediator Scheinman who's very well known, as you know, does enormous cases of all sorts.  And he helped us with Barry Peek, his colleague who also mediates and we mediated --

THE COURT:  Mr. Peek and Mr. Scheinman work together?  Because Mr. Peek is a very frequent flyer in the FLSA and New York Labor Law mediations, so --

MR. WITTELS:  Right.  He's very knowledgeable. We mediated a number of cases both with him and more with Mr. Scheinman.  But he helped on this as well and they were both there at the mediation that we had and were able to close the gaps on certain issues.

So you know, we had really the best mediators

26

Proceedings

we could find here to try to resolve this and fortunately we did do that.

But I will tell you, you can see from the gap in your own timeline, the idea that it would take so long is pretty unusual for us from the time we asked for the stay, which was back in 2024, to the time we finally reached agreement was over a year. We don't like to negotiate settlement agreements that take so long because it's a lot of attorney time, a lot of effort. But we couldn't -- you know, that go see aspect of it, arm's length, we couldn't be -- our arms couldn't have been further apart. Let's put it that way.

THE COURT: All right. Fair enough. Mr. Ruzal, anything you'd like to add to the arm's length negotiation and/or the qualifications of the mediators and how that mediation process was fruitful for you?

MR. RUZAL: Yes, your Honor. I fully agree with Mr. Wittels. Mr. Scheinman, Mr. Peek are topnotch at what they do. My firm and myself personally have had multiple countless mediations before Mr. Scheinman.

With respect to the process afterwards, yes, it certainly was prolonged, perhaps unusually so. But nevertheless I agree reflects the arm's length negotiations that parties endeavored to achieve in order to finally reach their settlement before your Honor.

Transcriptions Plus II, Inc.

27

Proceedings

THE COURT:  All right.  Thank you.  So the next factors of course, the substantive factors, first turns to costs, risks, and delay of trial.  And the delays in costs and risks here I think are self-evident in many ways.  But is there anything you'd like to highlight in that regard, Mr. Wittels?

MR. RUZAL:  Yes, your Honor.  I think in a case obviously that's gone on for so long really the idea of the risk is even exacerbated here because memories fade and the ability to obtain documents that might be necessary for certification without a court preliminarily approving it as part of the settlement package makes it really very difficult.

As I said, there were a number of data points that we wanted to get that would be really straining probably both sides' ability to obtain them.  Not only already been asking for them, which we'd asked for, but in terms of their producing them because you're talking about when there's an eight-year gap between the time of filing and revival of the overtime claim, you'd have to, even though they might be under a duty somewhat to maintain records, to have the documents we wanted, GPS records, handheld records.  Those items, you know, they might not have held, kept.  So it would have been very, very difficult.

28

Proceedings

And we had another case that actually is coming up for approval in another court in the southern district but involving almost the same type of issues and whether there was overtime involved. And we got -- in that case after motion after motion we finally got the GPS records. We got -- we had video that we were able to get. So there's a lot of things you have to get and we're expert at getting. But in a case eight years later that would have made the hurdles maybe insuperable. So to the extent we could maintain a class could be a difficult question.

I think on the deductions, we felt very strongly that we would be able to get certified on that. And again, that is indicated in how the allocation method would be devised.

THE COURT: Fair enough. Mr. Ruzal?

MR. RUZAL: Your Honor, again, so earlier as Mr. Wittels had stated the age of the case informs the risk from the defendant's perspective as well particularly with respect to any witnesses who might be providing testimony at trial. Of course certain electronic digital data points which again, you know, putting aside solid record-keeping and respect for the judicial process with respect to preservation, one never knows when we're talking about electronic data and

29

Proceedings

whether or not that will hold.  So in that regard, we fully agree that the risks were just as apparent for defendants as they were for plaintiff and the putative class.

THE COURT:  Thank you.  So now I want to discuss with you the method of distribution and claims processing.  I was very interested to learn, first of all, the class administrator's fee in this case is extremely reasonable compared to many other fees I've been seeing lately.  So I was delighted to see that number.

But I also was fascinated to understand how they were going to do this.  The method that you describe in the papers is that they plan to issue the checks directly.  I take it this is based on your data analysis that you've already done and the adverse information and whatnot.

So I just want to have you make a record of how they're going to be identifying -- to whom to cut tracks and in what amount and what's due when they don't have the correct current address for folks because I would imagine that with this length of time there's been a fair bit of employee turnover, people, people change states, jobs.

So can you just please help me understand the

30

Proceedings

mechanics of what the claims administrator is going to be doing?

MR. WITTELS:  Sure.  We'd like to open with the fact that we think it's a really robust claims process. The reason we believe that it is, (A), we were able to convince the defendants to agree to notice on the two methods, not only mailing but emailing if they have that information for the class members.

The company obviously paid people from their payroll records both prior and current workers.  So for the current workers it's not going to be that difficult to identify and send notice to those workers.

For the prior workers, the claims administrator will get the class list within I think 20 days after your Honor hopefully approves preliminary approval.  And then the notice, the claims administrator, a very good claims administrator, will put those names through the national, NCOA I think it's called.  I never get the acronym right, but where they do a search of the addresses to see if they can update them to make sure they're accurate.  So will go out under two ways.

The other aspect of why notice here is robust and following the federal judicial rules is (A), if the rules, the Federal Judicial -- I forget that.

THE COURT:  Center.

31

Proceedings

MR. WITTELS: Center. Thank you. I appreciate that. States that if you know who the class is, you shouldn't make them put in a claim form. And so they don't have to put any claim form in. There's a check going to be cut automatically and it will be mailed to them. So that we've obtained that aspect of it.

There's also going to be a reminder notice if the plaintiff class member does not cash its check within I think it's a 90-day window for the entire -- is it 60 or 90? 60. No, 90. Sorry. think it's 90. But halfway through, I think it's 45, I get a reminder notice that they've not submitted their --cashed their check.

So the hope here is that with this very proactive aspect of the claims administrator doing his diligence, or her diligence, to obtain the addresses, get the emails from the defendants to the extent they have them, there'll be a -- most of the checks will, you know, go out and be cashed. That's the hope.

THE COURT: I'm just worried about texts going out to addresses that aren't current. You know?

MR. WITTELS: We've done a lot of these. You'd be surprised the small, small number --

THE COURT: Okay.

MR. WITTELS: -- that that occurs.

THE COURT: Can you give me a little insight

Transcriptions Plus II, Inc.

32

Proceedings

into Arden's qualifications and background?  I know you've mentioned it there, you've used them.  So I'm just curious kind of whether they've handled similar types of class actions and what their qualifications are.

MR. WITTELS:  They have done many class actions.  They've worked with us on a number.  They've very responsive I would say.  One of the best aspects of Arden, if you have a problem you call them to fix up this person, their name will -- I deal with, I don't know if the defendants deal with them, but they've been very responsive and they know the field.

THE COURT:  Mr. Ruzal, is there anything you'd like to add to this aspect, the effectiveness of the distributional claims processing element?  This is an impressive plan.  Just the devil's in the details.  So you're mailing checks to over 1,600 people.  So I just wanted to understand why this will work from your point of view.

MR. RUZAL:  Your Honor, I think it's appropriate here, and that was a negotiating point for the parties, but because again going back to the age of the case we thought making sure that checks get into the hands of the individual is the best way for us to, you know, fully extinguish the claims based on ample consideration.

33

Proceedings

With respect to whether a potential check going to a wrong address, certainly a possibility, certainly things that were an issue that we discussed with plaintiff's counsel.

But I do agree with Mr. Wittels insofar as Arden, with whom I've worked personally and our firm has worked often times, does a very good job at making sure that they're locating the right address for the right class member.

There's also a process within the agreement to the extent that a settlement check is lost or sent to the wrong address so that that individual who did not receive a check can hopefully be made whole upon notification.

And so we were hoping to, you know, have some sort of mechanism such as this that would help address those hopefully rare instances, if ever, that the check is going to the wrong address and someone doesn't receive it.

THE COURT: Okay. Thank you. Thank you for that.

All right. The next element that I need to address is attorneys fees. And I know that class counsel here is requesting fees of no more than one-third of the $1 million settlement fund plus litigation expenses of up to $15,000. This is of course a routine one-third

34

Proceedings

attorneys fee. I also note that it is far, far, far lower than the lodestar. So I have no concerns about the attorney fee proposal that I think would impede settlement approval. Just we'll need to see those billing records of course at the time of final settlement approval under Second Circuit case law that's not optional. So with that caveat, I see no issue with regard to the attorneys fee element.

The other agreements element that I need to look at under rule 23(e)(3) I note that the paperwork indicates that there are no other agreements. I just wanted to confirm that on the record. Mr. Wittels, are there any other agreements between the parties that I need to look at?

MR. WITTELS: No. No, your Honor.

THE COURT: Mr. Ruzal, any other agreements that I need to see?

MR. RUZAL: No, your Honor.

THE COURT: Any agreements at all, Mr. Wittels?

MR. WITTELS: No, Judge.

THE COURT: Mr. Ruzal?

MR. RUZAL: No, your Honor.

THE COURT: Okay. Thank you.

MR. WITTELS: It was hard enough getting this agreement.

35

Proceedings

THE COURT: I believe that. I believe that. I told my clerk when the case was kind of revised following that motion for reconsideration, the level of -- the litigiousness became very palpable very quickly to me in terms of how the case had been proceedings because it had been quiet during my tenure until that motion for reconsideration. And so when I saw that you guys were on track for settlement I was very, very happy to see that that was where you guys were going because I was envisioning this being one of these cases that spends over 15 years and just really struggling to see how that was going to work out for you all. So I'm very glad we're here at this stage.

So we talked a little bit about equitable treatment already. And I note that we discussed the pro rata recovery plus this class B proposal for the deductions class to help ensure that anybody who had a deduction even after the period of time in which that was policy is made whole.

I also note that the settlement agreement provides plaintiffs, anticipates requesting that plaintiff through counsel will seek a service award and not in excess of $15,000. So I'd like to just make a brief record as to how Mr. Swanson has been involved such that he would be entitled to a compensatory award of that

Transcriptions Plus II, Inc.

Proceedings

amount because that's obviously much higher than what the other folks are getting.

MR. WITTELS:  Sure.  Of all the class representatives I've had the pleasure you might say of getting to know, I would say that Mr. Swanson is one of the more responsive and steadfast plaintiffs because he survived an over ten-year ordeal.  And when you call up a plaintiff like Mr. Swanson and can still get in touch with him that many years later, he really is a solid class representative.

He is the one who approached our firm about, you know, originally the deductions and perhaps the over, well, and the overtime aspect of the case.  He'd been working there for many years beforehand and he did so at great risk because any time a plaintiff steps forward who's still working for the company, he is subject to perhaps what he might perceive as, or she might perceive as, potential retaliation from the company.  He was nervous about doing it but he did it and was still able, through one might say also the good offices of the defendant which didn't fire him.  They actually -- at one point he was demoted from driver to helper.  He was very unhappy about that.  That came about through a separate complaint he was making that's unrelated to this lawsuit. I won't even get into the details of it.  But he was

37

Proceedings

very, very unhappy about that. He was wondering if it somehow had anything to do with his having brought the lawsuit.

But the point being, as I said, he was a rock solid plaintiff. He gave us the -- he was able to give us the documents, all the documents he had, all the payroll records, pay stubs he was able to maintain over a long period of time. He gave us the testimony not only to us but he was deposed at length, so he had his deposition taken. He prepared for it, came in, gave up his time to do that, and was still always available to speak with us during the process and, you know, so this through for a long period.

And I don't think this is an exceptions award. The courts can give more, they can give less, but I think given that it's only that amount if you take it over the ten-year period, it's a little over $1,000 a year and it's more than adequate and fair we believe.

THE COURT: All right. Mr. Ruzal, do you have anything to add?

MR. RUZAL: Your Honor, recurring theme here, age of the case. You know, while $15,000 seems to be a little bit high on a range of what a service award would be in a wage and hour class action for a named plaintiff, it's apparent to defendant that, you know, given Mr.

38

Proceedings

Swanson's involvement in the case through discovery, deposition, and over this lengthy span of the life of the case, defendant does not have an objection to it necessarily.

THE COURT:  Okay.  Thank you.  So again, similar to the fees, this should include in your final settlement approval a brief synopsis as to why that degree of difference is appropriate as compared to what the other, you know, putative plaintiffs end up receiving because it is a little bit of a high award based on review of the case law, but it's certainly not extraordinarily so such that I think it will preclude final settlement approval.  I just think it will need to be decently justified in the final settlement approval motion.

So now turning to the remaining *Grinnell* factors, we've discussed at length the stage of the proceedings versus the amount of discovery.  So unless anybody feels strongly that we overlooked something there, I don't think we need to address it.  Mr. Wittels, anything on the stage or proceedings or amount of discovery?

MR. WITTELS:  No, your Honor.

THE COURT:  Mr. Ruzal?

MR. RUZAL:  No, your Honor.

Transcriptions Plus II, Inc.

39

Proceedings

THE COURT:  All right.  Now I'd like to turn to the ability to withstand a greater judgment.  The plaintiff asserts that this factor should be given negligible consideration and I don't think that ability to pay has really been an issue or a defense in this case.

I think the question for both of you is how I should analyze this factor in the *Grinnell* analysis given that it's not a question of ability to pay.  I think it's really more of a question as I'm viewing it as how to weigh this factor in the *Grinnell* analysis.

So Mr. Ruzal, I'll start with you since this is a defense factor to an extent, how should I be thinking about this factor?

MR. RUZAL:  This, Your Honor, so in thinking -- well, as Mr. Wittels said, discussed earlier today with respect to the reimbursement claim really seemingly being perhaps the highest potential avenue of relief for plaintiffs to go forward if they were to proceed to trial if defendants were not agreeable to entering into a settlement here today or to sign the agreement to go before your Honor for this fairness hearing, there certainly could be a greater risk of, you know, a higher award but there might very well be less of an award.

The defenses here we believe are robust.  We

Transcriptions Plus II, Inc.

40

Proceedings

believe that our witnesses who already provided deposition testimony and who would be prepared to do so at trial would be able to provide a compelling defense and otherwise avoid potentially what we think could be ultimate relief in form of a judgment.

THE COURT:  Right.  And how do you think I should think about this factor, Mr. Wittels?  Because I don't think the defendant's finances are really at issue. We don't have discovery about them to any great extent that I've been provided.

MR. WITTELS:  Right.  I think the *Grinnell* factors give you some flexibility, your Honor, to -- like one of the factors is that doesn't come into play is the reaction of the class.

THE COURT:  Right.  Not into play yet, yes.

MR. WITTELS:  Right, right.  So I just think you say it really doesn't play into -- you know, you don't have to address it as informing whether the settlement is reasonable because this is a defendant that has more than adequate resources.  So I don't think it's just something you say didn't really inform the ultimate settlement amount or fairness.

THE COURT:  So is it fair to say from your perspective, Mr. Wittels, that you're settling the claim based upon the valuation that you actually ascribed the

41

Proceedings

damages that you find provable as opposed to giving them a big discount because of inability to pay?

MR. WITTELS: Correct.

THE COURT: That's what I inferred from all the papers. I just wanted to make a little bit of a record of it.

On that same score, the range of reasonableness of settlement, you've already touched upon how the damages here that you're able to more readily prove is about 60 percent of what you think would be readily provable. And that seems to me a pretty respectable percentage in the class action context. And so given the litigation risks that everybody has discussed so far and the age of the case, is there anything else you'd like to touch upon with regard to the range of reasonableness of the settlement overall, Mr. Wittels?

MR. WITTELS: Not really. I think it's covered.

THE COURT: All right. Mr. Ruzal?

MR. RUZAL: No, your Honor.

THE COURT: Okay. So now 23(a) factors, the four big factors with ascertainability added by New York Second Circuit Court of Appeals case law. I don't think there's really any question about numerosity or commonality or typicality. We've already talked about

42

Proceedings

adequacy of representation.  Anything you'd like to talk about with regard to the Rule 23(a) factors, Mr. Wittels?

MR. WITTELS:  No, your Honor.  I think they sort of overlap in a sense with *Grinnell* but I think we've covered it adequately, and you have.

THE COURT:  Yes.  Well, it's also very clearly laid out in your papers, so thank you for that.

Anything you'd like to touch upon with regard to the Rule 23(a) factors, Mr. Ruzal?

MR. RUZAL:  Your Honor, defendant doesn't have anything to add in this regard.

THE COURT:  Okay.  So now I'd like to talk about the notice of procedures because this is actually what really gives the -- where the rubber meets the road for the actual putative class.

So I note that your memorandum and declaration, Mr. Wittels, set forth the parties' intended notice procedure.  You already touched upon the fact that you're going to be engaged in both email notice and the mailing notice.  I think that's all really helpful.

I also appreciated your adoption of some of the Federal Judicial Center's guidance in terms of how to make things as clear as possible for lay people.

But in that regard, there are a couple of things in the notice itself that I wanted to touch upon.

43

Proceedings

So if I could actually ask everybody to turn to the form notice that was docketed at ECF 181-4.

So one question. I have a few sort of just typo type of things which we can over at the end. But a couple of substantive things that I wanted to discuss.

First is in terms of the representation by counsel how to participate if you're a putative class member, I don't think it says anywhere in here that parties have a right to appear pro se, which they do. And you know, I think that this is a common thing that is overlooked in settlement class action notices. So I was thinking perhaps somewhere in the objecting to settlement portion, for example, on page 6 it says, "You have the right to retain a lawyer at your own expense to present your objection." Doesn't the class member have a right just to present their objection without a lawyer at all, Mr. Wittels?

MR. WITTELS: Certainly does, yes.

THE COURT: Yes. So I just think we need to add that sentence perhaps in that section and then also in the lawyers representing you section. I think it is obviously completely accurate that we, you know, assuming that my, previewing my conclusion here, guys, assuming that Judge Vitaliano adopts my recommendation to appoint you as class counsel, the lawyers representing you

44

Proceedings

portion will also accurately say the Court has appointed them to represent you. Somewhere in there though I do think we need to note that they have the right to represent themselves and/or hire a different lawyer if they were so to choose.

And so that aspect is one substantive issue that I wanted to flag. Any concerns about trying to incorporate that sentiment, Mr. Wittels?

MR. WITTELS: No, your Honor. That's helpful.

THE COURT: Mr. Ruzal?

MR. RUZAL: No, your Honor.

THE COURT: Okay. Then the other thing that I wanted to understand better, and this is just, you know, coming at this from a 50,000 foot perspective where you guys are like deep, deep in the weeds, right? The settlement benefits, what you get section, it talks about through the proposed settlement what different people will be able to receive. And there's a discussion about the reimbursement subclass and subclass B drivers and --

MR. WITTELS: Did you pick up that we list saying A?

THE COURT: Well, there's no A and there's no explanation ever as to what that is unless you read the 31-page settlement agreement.

MR. WITTELS: Right, right. It was a mistake

45

Proceedings

and we're going to be correcting that.

THE COURT: Okay. Okay, good.

MR. WITTELS: Right there -- and now I know your Honor is the closest reader I've ever seen of any --

THE COURT: And my clerk too. She --

MR. WITTELS: And your clerk. Good catch there. You're hired.

Yes, it should have said after the 739 or as it did sort of below that that's for subclass A.

THE COURT: Okay. So I'd like you to work on language that everyone agrees to just sort of clarify what that section means so that people aren't expected to read the entire settlement agreement as a cross reference because that's just not a reasonable ask of your average folks. Right? Like the lawyers, and what judges these things are lengthy to read. And for people who have a busy life and they're driving a truck and, you know, I don't want them to have to do document interpretation to understand what they might get and the various classes and how those classes are defined. So I do think that needs to be included somewhere.

All right. So in terms of just some very basic things, if you want to just go through, because it's Court approved notice, I am going to belabor you with -- I'm going to go through some of these little tiny edits.

Transcriptions Plus II, Inc.

46

Proceedings

On the first page, how does the defendant have their name?  Is there a comma before the LLC or no?

MR. WITTELS:  I don't think so.

MR. RUZAL:  I actually don't believe so, your Honor, but I will confirm that.

THE COURT:  Yes, just confirm that.

MR. RUZAL:  Yes.

THE COURT:  Because we weren't sure if there needed to be a comma there.  That really touches upon how they actually use their name.  But in the case caption I think the comma appears.  So I just wanted to understand what the correct legal name of the entity is for the purposes of this first page.  If you're employed by Manhattan Beer Distributors, I don't think the comma is dispositive, non-dispositive in terms of relief, but I just wanted to be accurate.

So page 3 is the next section where we just found a little bit of a reading challenge.  The second sentence in the second section, what is this lawsuit about and why is there a settlement?  Second sentence says, "Defendants deny these allegations and any wrongdoing and contends --" I think there's just the subject-verb agreement issue.  Contend that they paid all of their employees.  Right?  Because isn't defendants plural?

47

Proceedings

MR. RUZAL:  Yes, your Honor.

MR. WITTELS:  Yes, it is.

THE COURT:  Yes.  So just if you could cleanup that sentence.  The defendants contend that they paid all of their employees correctly.

And then you have both in the last sentence of that section.  Shouldn't that be all if defendants is plural, Mr. Ruzal?

MR. RUZAL:  I believe you're right, your Honor.

THE COURT:  Okay.  Thank you.  All right. We've already talked about clarifying the next section, the settlement benefits, what you can get depending upon your subclass.

And then, all right, the next section that I think we just noticed a little tiny typo on page 4, the last sentence in the middle section, "What am I giving up to get a payment as part of the settlement?"  That settlement on the very last sentence there is not a capitalized S and you have it as a defined term elsewhere.  So I just thought for consistency you might want to uppercase that settlement.

MR. WITTELS:  Where's that?

THE COURT:  I see Mr. Roman is marking it. He's got it.  I can tell from here.  Okay.

All right.  The next section, you have *Swanson*

48

Proceedings

*v. Manhattan* Beer Distributors *LCC* in the middle of the paragraph.

MR. WITTELS:  Oh, there's a comma.

THE COURT:  Thank you, Ms. Chan.  That was one of her catches.

All right.  Okay.  And then the next thing that I note, we noticed, both of us, is on the next page, page 6, it looks like Word is messing with you because the second list, the second number of lists on page 6 starts with number 7.  You see that?

MR. WITTELS:  One, two, three, four, five, six, seven.

THE COURT:  You want it to be a continuation of the top?

MR. WITTELS:  Oh, you mean there's a -- it's not indented properly?

THE COURT:  No, it starts with number 7 instead of number 1 again.  And then we wanted to understand if that was actually your goal or if it should be a new list.  You think it should stay 6?

MR. ROMAN:  Yes, your Honor.  So this second list is saying like the paragraph above it, in addition, so there's an extra condition here.  So if this is present, then you also need these additional items. That's why the numbering is continued.

Transcriptions Plus II, Inc.

49

Proceedings

THE COURT:  I understand that but I also think that that's like a lawyer's way of thinking about the world.  I don't know, Mr. Ruzal, what do you think?

MR. RUZAL:  Your Honor, honestly I don't have a particularly strong opinion about it, but I'm happy to defer to the Court.

THE COURT:  I think we should have a litigation about it.  No, it's just one of those things that as a reader who's a non-lawyer, I was wondering if they were just going to think it was a mistake.

MR. WITTELS:  So why don't we just say one, two -- I think you're right.  Let's just say in addition, you have to do one, two, three, four, five.

THE COURT:  Okay.  And if we're going to do it that way, paragraph 6 at the top should have a period instead of a semicolon.

MR. WITTELS:  Yep.

THE COURT:  Okay.  We already talked about incorporating language in the penultimate paragraph of that section on page 6, "You have the right to retain a lawyer at your own expense to present your objections or appear on your own behalf."  Something along those lines should be incorporated there.

And then we also want to incorporate the concept of pro se appearance into the lawyers

Transcriptions Plus II, Inc.

50

Proceedings

representing you section.

MR. WITTELS:  Your Honor?

THE COURT:  Yes?

MR. WITTELS:  Yes, on that point, I'm not going to use, unless you require it, I wouldn't use the word pro se.

THE COURT:  I agree with you.  The right to represent yourself --

MR. WITTELS:  Okay.

THE COURT:  -- I think is the better phrasing that I've seen in these class notices.

MR. WITTELS:  Okay.

THE COURT:  Or you appear on your own behalf. I've seen it a few different ways.  Also, you have the right to appear on your own behalf or represent yourself, or retain a lawyer.  You know, you can use whatever phrasing you think is going to be the most understandable.

MR. WITTELS:  Right.

THE COURT:  All right.

MR. WITTELS:  Thank you.

THE COURT:  Okay.  Then the next thing, bottom of 7, so it says we'll hold a hearing in courtroom wherever.  We will -- that's TBD.  I think we should just call it what it is, the United States District Court,

51

Proceedings

Eastern District of New York.  You think that's too clumsy for potential class members?  I just think it's clearer.

MR. WITTELS:  Probably a little.  You know, it's up to you, your Honor.

THE COURT:  I mean it's not wrong --

MR. WITTELS:  I mean United States Courthouse --

THE COURT:  -- to call it the courthouse.

MR. WITTELS:  Sure.  Do you want to say --

MR. ROMAN:  It says the courthouse on the other side.

MR. WITTELS:  What?

MR. ROMAN:  It says United States Courthouse on the other side.

THE COURT:  Does it say that?  I very rarely go in the front door.

MR. WITTELS:  Wow, that's a good catch.

THE COURT:  I have a picture of all my Girl Scouts like under that thing outside but I don't have my phone with me so I don't know what it says.  My Girl Scouts had a big field trip here.  It was so great.  The marshals brought out like a really awesome female marshal and the U.S. Attorney's Office proffered up a former Girl Scout.  It was like really cool.  They got the Davon Dog.

52

Proceedings

Like it was amazing.  We had like over 40 Girl Scouts, three different troups.

MR. WITTELS:  Wow.

THE COURT:  On a day they had off school.  So I have a big picture of the front of the courthouse but I can't in my mind's eye remember what it says.  Isn't that funny?

All right.  So I don't object to calling it courthouse.  It is the courthouse.  But it never says United States District Court, Eastern District of New York.  So I don't know if it needs to.

MR. WITTELS:  So we'll say that, United States District Court, Eastern District right there.

THE COURT:  Okay.  All right.  And then the very final thing is do I have to attend the fairness hearing?  As long as you send a valid objection.  And then the very last sentence of that first paragraph, you may also pay your own lawyer to attend the fairness hearing but it is not necessary.  Or they can come, right?  They don't need a lawyer.  So I just wanted -- that same through line of the potential for pro se, or you know, self-appearance.  I just wanted to make sure that was picked up in that section as well.

So any concerns or issues with the small nits that we saw in your notice, Mr. Wittels?

53

Proceedings

MR. WITTELS:  No, your Honor.  I just want to make one little aside here.  When you talk about or you can come yourself, the very first class action I had, because this might be my last if -- no, no, there are a few more.

THE COURT:  Okay.

MR. WITTELS:  I'm trying not to --

THE COURT:  Start new ones.

MR. WITTELS:  I'm stepping, yes, I'm trying to step back.  Well, other people are but I'm stepping back a little.  But Judge Gammerman, do you remember that name?

THE COURT:  I don't, no.

MR. WITTELS:  Oh, goodness.  He was a state court justice in New York Supreme for years, very well known, and handled all the class action stuff.  I remember the first class action we went down for the final fairness hearing and anyone here?  Looks around the room.  One guy said yes, I'm here.  Who are you?  Said well I drove up from South Carolina today for this.  And he goes well, thank you very much.  That was it.  I mean so I felt badly --

THE COURT:  Oh wow.

MR. WITTELS:  -- that he had driven all the way because he misunderstood.  Thought oh, I thought I had to

Transcriptions Plus II, Inc.

54

Proceedings

come.

THE COURT:  Wow.  So at least our class members are largely New Yorkers unless they've moved post employment, or New Jerseyans maybe.  You know?  In the area hopefully.  I've never had anybody show up to be honest.

MR. WITTELS:  Right.

THE COURT:  But you know, I do think we need to like --

MR. WITTELS:  No, I --

THE COURT:  -- not scare them off by thinking they need to either have a lawyer or accept your representation, as able as it is.  We just need to make sure they're informed of their rights.

MR. WITTELS:  Sure.

THE COURT:  Okay.  Thank you.  Mr. Ruzal, any concerns about the notices, the nits?

MR. RUZAL:  None, your Honor.

THE COURT:  All right.  Terrific.  So here's my question.  When can we expect a revised notice?  Let's just set a deadline for that and so we can also have a timeline.  I imagine this isn't going to take you very long.

MR. WITTELS:  By the end of the week, sure.

THE COURT:  Okay.  No problem.  So today is the

55

Proceedings

2nd.  End of the week I think is the 7th.  Is that right?  6th?

MR. WITTELS:  6th.

THE COURT:  6th?  Okay.  I don't have my calendar in front of me.  So February 6th we'll expect your notices and I note, of course, that this case, this motion has been referred to me by Judge Vitaliano.  So I am prepared to recommend preliminary approval of the settlement and settlement class and the notice as corrected.  We will need to write it up in an R&R and then there will be the two-week window.

So if the parties were so inclined, you may consider consenting to my jurisdiction for the case or for purposes of the motion which might be a good option in a case like this.  If you've ever looked into AO Form 85A, that form would permit me to rule on the motion and then get the notice of procedures well underway.

Given all my recent cases with Judge Vitaliano, I wouldn't be at all surprised if he would refer the final settlement approval to me as well since we're handling the preliminary.

So we can check with him if he's comfortable with all that.  We could then, you know, we could confirm it and set the final settlement hearing date with my chambers so that you can include it in the notice.

56

Proceedings

That's why we need to know now. But we can -- it's up to you. No pressure to consent. I just wanted to flag that as an option. Sometimes people don't know that it's a possibility to consent for the motion without giving up the district judge's assignment yet. And if at a later time you choose to consent for all purposes, that's an option as well. Any questions about the consent process, Mr. Wittels?

MR. WITTELS: No, your Honor. Thank you.

THE COURT: All right. Mr. Ruzal?

MR. RUZAL: Not for me, your Honor.

THE COURT: Okay. With that, anything else anybody wanted to add? Anything that you think I need to know in evaluating this settlement agreement that we haven't already discussed? Mr. Wittels?

MR. WITTELS: No, your Honor. You've been very thorough.

THE COURT: Mr. Ruzal?

MR. RUZAL: I agree, your Honor, nothing.

THE COURT: All right. Thank you, all. Have a great rest of your day. And we will look for the revised notice by Friday and you'll be getting a R&R in the coming weeks. I can't promise exact timing. Finishing up the six month list motions right now, but they're almost done, so we're in good shape.

Transcriptions Plus II, Inc.

57

Proceedings

All right.  Anything final, Mr. Wittels?

MR. WITTELS:  No, thank you.

THE COURT:  Mr. Ruzal?

MR. RUZAL:  No.  Thank you, your Honor.

THE COURT:  All right.  Thank you, all.  Have a great rest of your day.

MR. RUZAL:  Thank you.

(Matter concluded)

-oOo-

58

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **9th** day of **February**, 2026.

_Mary Greco_
Transcriptions Plus II, Inc.